**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
John A. Yanchunis*
201 North Franklin Street, 7th Floor
Tampa, Florida 33602
jyanchunis@forthepeople.com

**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
MICHAEL F. RAM (SBN 104805)
1390 Market Street, Suite 200
San Francisco, CA 94102
Telephone:    (415) 358-6913
Facsimile:    (415) 358-6923
Email: mram@forthepeople.com

**HECHT PARTNERS LLP**
Kathryn (Lee) Boyd
Cal. Bar. No. 189496
2121 Avenue of the Stars, Suite 800
Los Angeles, CA 90067
Telephone: (646) 502-9515
lboyd@hechtpartners.com

*Attorneys for Plaintiff*
*Additional counsel listed on signature page*
*\*Pro Hac Vice forthcoming*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEFFREY BOYLETT, individually and on behalf of all others similarly situated,<br><br>                              Plaintiffs,<br><br>          v.<br><br>META PLATFORMS, INC., and LUXOTTICA OF AMERICA, INC.,<br><br>                              Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Jeffrey Boylett ("Plaintiff Boylett" or "Plaintiff") brings this putative class action on behalf of himself and all others similarly situated ("Class Members") against Defendants Meta Platforms, Inc. ("Meta") and Luxottica of America, Inc. ("Luxottica") (collectively, "Defendants"), for privacy violations arising out of the unlawful use of Plaintiff's and Class Members' private audio and visual recordings on their Meta AI-enabled smart glasses (the "Meta AI Glasses" or "Glasses").

## NATURE OF THE ACTION

1.     The story of the Meta AI Glasses is one of promises made to consumers—and promises broken. Defendants marketed the Meta AI Glasses as a revolutionary product built with privacy at its core. Consumers were assured that the devices were "designed for privacy," "controlled by you," and engineered to safeguard the sensitive recordings they captured. Those assurances were not merely background marketing. They were central to Defendants' campaign to convince consumers to bring always-on, AI-enabled cameras and microphones into the most private spaces of their lives.

2.     But behind the scenes, the reality was starkly different. Whistleblowers working as subcontractors tasked with reviewing recordings captured by the Meta AI Glasses began to reveal what Defendants had not told the public. Contrary to Defendants' assurances that privacy protections and anonymization safeguarded user content, recordings captured by the devices were routinely routed to human reviewers for manual inspection.

3.     These reviewers were not simply examining abstract or anonymized data. They were watching and listening to deeply personal moments inadvertently captured by the devices. According to whistleblower accounts, reviewers routinely encountered footage depicting individuals inside their homes engaged in intensely private activities—people changing clothes, using the bathroom, engaging in intimate sexual conduct, caring for children, handling medical or financial documents, or going about ordinary activities within the supposed sanctuary of their homes.

4.     One reviewer described the experience bluntly: "We see everything—from living rooms to naked bodies. Meta has that type of content in its databases. People can record themselves in the wrong way and not even know what they are recording." Other subcontractors reported

encountering recordings containing highly sensitive identifying information, including bank cards, personal paperwork, and private documents inadvertently captured by the glasses' cameras.

5. These revelations stand in direct conflict with the privacy assurances Defendants repeatedly gave to consumers. No reasonable consumer reading statements such as "built for your privacy" or "designed for privacy, controlled by you" would understand that recordings made inside their homes—including bedrooms and bathrooms—could be viewed, cataloged, and analyzed by human workers located across the globe.

6. Yet Defendants built their marketing around those very assurances. Privacy was not an incidental feature of the product—it was a central selling point. Defendants encouraged consumers to trust that they could safely wear the devices in their homes, around their families, and during the ordinary moments of daily life.

7. Having chosen to make sweeping assurances about privacy and user control, Defendants had a duty to disclose material facts necessary for consumers to understand the true nature of the product they were purchasing. Instead of doing so, Defendants concealed the extent to which recordings captured by the Meta AI Glasses would be reviewed by human contractors and subcontractors. Defendants failed to disclose that enabling the AI features central to the product could expose intimate recordings to manual review by workers who were strangers to the user.

8. These omissions were not trivial. The Meta AI Glasses are designed to capture the world as users move through it—often without the user fully realizing what is being recorded in the background. The devices therefore predictably capture private moments occurring inside homes, workplaces, and other personal environments.

9. Consumers relied on Defendants' privacy assurances when deciding to purchase the Meta AI Glasses. Believing the devices were engineered to safeguard their privacy, consumers brought these AI-enabled cameras and microphones into bedrooms, living rooms, kitchens, and other intimate spaces.

10. The result was predictable. By 2025, millions of pairs of Meta AI Glasses had reportedly been sold. With each new device placed into circulation, the scope of potential privacy exposure expanded—not only for users but also for family members, guests, children, and bystanders

CLASS ACTION COMPLAINT                                    HECHT PARTNERS LLP

who never meaningfully consented to being recorded or having recordings of their lives viewed by remote human reviewers.

11. These recordings frequently capture individuals who never purchased the device and never meaningfully consented to being recorded or having intimate aspects of their lives viewed by remote human reviewers employed by Defendants' contractors.

12. This case arises from Defendants' decision to market a surveillance-capable product as privacy-protective while concealing practices that exposed consumers' most intimate moments to human review. Plaintiff and members of the proposed Class purchased the Meta AI Glasses in reliance on Defendants' express and implied assurances regarding privacy.

13. No reasonable consumer would have purchased—or paid the price they paid—for the Meta AI Glasses had Defendants disclosed the truth: that enabling the product's AI features could route recordings of their homes, families, bodies, and personal information to human reviewers around the world.

14. This nationwide class action seeks to hold Defendants accountable for their deceptive marketing, their failure to disclose material facts, and the profound invasion of privacy their practices created for millions of consumers and unsuspecting bystanders.

15. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members suffered concrete and particularized injuries, including invasion of privacy, loss of control over highly sensitive personal information, interception and disclosure of confidential communications, exposure of intimate audiovisual recordings to third-party human reviewers, and diminution in the value of the Meta AI Glasses they purchased. Plaintiff and Class Members also paid a price premium for a product marketed as privacy-protective and user-controlled that did not in fact provide the privacy protections promised by Defendants.

16. Because millions of devices have been sold, Defendants' practices have resulted in the potential collection and review of an enormous volume of audiovisual recordings captured inside private homes, offices, and other non-public places across the United States.

## THE PARTIES

CLASS ACTION COMPLAINT                                          HECHT PARTNERS LLP

3

17.     Plaintiff Jeffrey Boylett is a citizen of Lake County, Indiana. Plaintiff Boylett began using the Ray Ban Meta AI Glasses in or around March 2023.

18.     Meta is a Delaware corporation with its headquarters in Menlo Park, California. Meta does business throughout California. Meta designs, manufactures (in partnership with EssilorLuxottica S.A.), distributes, markets, and sells the Meta AI Glasses. Meta owns and operates the AI software, cloud infrastructure, data processing systems, and contractual relationships through which user-captured footage flows from the Glasses to Meta's servers and onward to its subcontractors.

19.     Defendant Luxottica of America, Inc. is an Ohio corporation with its principal place of business located in Mason, Ohio. On information and belief, Luxottica, in partnership with Meta, advertises, markets, and sells the Meta AI Glasses throughout the United States. Luxottica also participates in branding, product promotion, and consumer disclosures regarding the privacy and functionality of the Meta AI Glasses and therefore played a direct role in disseminating the privacy representations challenged in this action. The conduct described herein was authorized, ratified, and/or approved by Luxottica and its agents, and the advertisements for and promotion of Meta AI Glasses were disseminated throughout California and the nation by Luxottica and its agents to deceive and mislead consumers into purchasing the Meta AI Glasses. Luxottica, as Meta's manufacturing, branding, and retail partner and the U.S. distributor operating consumer-facing channels, participated in, approved, and disseminated the privacy misrepresentations and omissions alleged herein, and is independently liable, along with Meta, for its role in deceiving consumers about the privacy implications of the Meta AI Glasses.

## JURISDICTION AND VENUE

20.     This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members, the amount in controversy exceeds $5,000,000, exclusive of costs and interest, and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

21.    This Court has personal jurisdiction over Defendants because Defendant Meta is headquartered in this District, and because Defendants purposefully availed themselves of this forum by conducting substantial business within California such that Defendants have significant, continuous, and pervasive contacts with the State of California.

22.    Venue is proper in this District under 28 U.S.C. § 1391 because Defendant Meta Platforms Inc. resides in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

***Meta and EssilorLuxottica Jointly Developed, Designed, and Brought the Meta AI Glasses to Market***

23.    The Meta AI Glasses were not brought to market by Meta alone but were developed and commercialized through a multi-year collaboration between Meta and EssilorLuxottica. Luxottica, as a subsidiary of EssilorLuxottica, was responsible for the physical eyewear side of the Meta's Ray-Ban branded products, including designing the frames (including, for example, the Wayfarer, Skyler, Headliner lines), selling them through retail channels, and participating in marketing of consumer disclosures regarding the product.  Meta developed and provided the technology for the Meta AI Glasses.  Defendants co-developed and co-marketed the Meta AI Glasses.

24.    In 2020, Meta publicly announced that partnership, explaining that the companies would work together to build and release Ray-Ban-branded smart glasses that combine Meta's technology with EssilorLuxottica's eyewear brands and manufacturing capabilities.[1]

25.    EssilorLuxottica's role was not limited to licensing the Ray-Ban name. The company contributed its eyewear brands, frame design expertise, lens and fit customization options, and global retail distribution network, enabling the smart glasses to be marketed through established eyewear channels as premium consumer eyewear rather than a niche technology device.

26.    Meta, for its part, supplied the connected-device architecture, voice assistant

---

[1] Meta, *Facebook Connect: Introducing Oculus Quest 2, a Partnership with EssilorLuxottica and More* (Sept. 16, 2020), https://about.fb.com/news/2020/09/facebook-connect-introducing-oculus-quest-2-a-partnership-with-essilorluxottica-and-more/ (last accessed Mar. 15, 2026).

functionality, mobile application ecosystem, and AI-driven software features that transformed the glasses from ordinary eyewear into a network-connected wearable computing device capable of capturing and transmitting user-generated data.

27.    In announcing the first-generation Ray-Ban Stories smart glasses in 2021, Meta explained that EssilorLuxottica and Meta worked together "from concept through final design" to integrate cameras, speakers, microphones, a processor, battery, and touch controls into frames modeled on Ray-Ban's iconic eyewear styles, including Wayfarer, Round, and Meteor.[2]

28.    The collaboration did not end with the first-generation product. In September 2023, Meta announced the next-generation "Ray-Ban Meta" smart glasses, again expressly stating that they were being launched "in partnership with EssilorLuxottica." Meta explained that the new glasses had been redesigned from the ground up, with improved cameras and audio, lighter and more comfortable frames, more than 150 frame-and-lens combinations, and voice interaction with "Meta AI" through the "Hey Meta" assistant.[3]

29.    The companies continued to deepen their relationship after the second-generation launch. In September 2024, Reuters reported that Meta and EssilorLuxottica had extended their smart-glasses partnership through a new long-term agreement to continue developing smart eyewear.[4]

30.    By 2024, Meta was publicly touting the commercial success of the jointly developed product line, stating that its second-generation smart glasses, developed in partnership with EssilorLuxottica, were "selling out faster than we can make them."[5] Meta also announced additional styles and new Meta AI features for the Ray-Ban Meta line of Meta AI Glasses, including "Meta AI

[2] *Ray-Ban and Facebook Introduce Ray-Ban Stories, First-Generation Smart Glasses*, Meta Tech Blog (Sept. 9, 2021), https://tech.facebook.com/reality-labs/2021/9/ray-ban-and-facebook-introduce-ray-ban-stories-first-generation-smart-glasses/ (last accessed Mar. 15, 2026).

[3] *Introducing the New Ray-Ban | Meta Smart Glasses*, Meta (Sept. 27, 2023), https://about.fb.com/news/2023/09/new-ray-ban-meta-smart-glasses/ (last accessed Mar. 15, 2026).

[4] EssilorLuxottica Expands Smart Glasses Partnership with Meta, Reuters (Sept. 17, 2024), https://www.reuters.com/technology/essilorluxottica-expands-smart-glasses-partnership-with-meta-2024-09-17/ (last accessed Mar. 15, 2026).

[5] *New Ray-Ban Meta Smart Glasses Styles and Meta AI Updates*, Meta (Apr. 23, 2024), https://about.fb.com/news/2024/04/new-ray-ban-meta-smart-glasses-styles-and-meta-ai-updates/ (last accessed Mar. 15, 2026).

CLASS ACTION COMPLAINT                                    HECHT PARTNERS LLP

6

with Vision," which allows users to ask the glasses about what they are seeing and receive helpful information completely hands-free.[6]

31.     Accordingly, Meta and EssilorLuxottica jointly developed, designed, branded, distributed, and commercialized the Meta AI Glasses and jointly benefited from their sale and expansion in the consumer market

*The Meta AI Glasses Capture Audio, Images, and Video and Route That Data Through Meta's AI Systems*

32.     The Meta AI Glasses are designed to capture audiovisual information from the user's surroundings and integrate that information into Meta's software ecosystem. The glasses incorporate outward-facing cameras capable of capturing photographs and video, a multi-microphone array for voice and ambient audio capture, open-ear speakers, and software integration with the Meta View (formerly Facebook View) application that enables users to import, edit, and share captured images, video, and audio.[7]

33.     Users can capture photos and videos directly from the glasses using either a physical capture button located on the frame or voice commands directed to Meta's voice assistant. When activated, the glasses record audiovisual content from the wearer's perspective.[8]

34.     Because the Meta AI Glasses are designed to capture audiovisual information from the user's surroundings during routine daily activities, the devices inevitably record private spaces such as homes, bedrooms, bathrooms, offices, and other locations where individuals possess the highest expectations of privacy.

35.     After photos or videos are captured, the content can be imported into Meta's companion application for the glasses, the Meta AI app (formerly Meta View (2021-2025) and Facebook View prior), which runs on the user's smartphone. Meta explains that the application

---

[6] *Id.*

[7] *Introducing Ray-Ban Stories: First-Generation Smart Glasses*, Meta (Sept. 9, 2021), https://about.fb.com/news/2021/09/introducing-ray-ban-stories-smart-glasses/ (last accessed Mar. 15, 2026).

[8] *Id.*

"makes it easy to import, edit and share content captured on the smart glasses" to applications on the user's phone, including Facebook, Instagram, WhatsApp, Messenger, Twitter, TikTok, and Snapchat. The application also allows users to save captured content to their phone's camera roll and manage or edit the media before sharing it through Meta's platforms or other services.[9]

36.     Meta AI Glasses are not merely passive recording devices, but integrated computing hardware designed to interact with Meta's artificial-intelligence ecosystem. Meta announced that the current generation of its smart glasses includes "improved audio and cameras" and allows users to interact with "Meta AI, our advanced conversational assistant," by saying "Hey Meta."[10] Through this system, the glasses capture audiovisual information from the user's surroundings and enable users to obtain information and control device features through voice interaction.

37.     The glasses are powered by the Qualcomm Snapdragon AR1 Gen 1 platform. Meta states that the processor enables higher-quality photo and video processing and faster compute performance for the device.[11] Qualcomm explains that the Snapdragon AR1 Gen 1 platform enables seamless capture, livestreaming, notifications, and "powerful on-glass AI," while supporting high-quality photo and video capture and advanced wireless connectivity.[12] The processor includes dual image signal processors for premium media capture and is optimized for lightweight, battery-efficient wearable devices, enabling the glasses to capture audiovisual information from the wearer's surroundings and transmit that information for software processing and AI-enabled functionality.[13]

38.     Captured media does not remain solely on the glasses themselves. Meta explains that "media you capture with AI glasses must be imported to Meta's AI mobile app (*i.e.*, the Meta View app, now called the Meta AI app) before you can view or share it."[14] Once imported, the media is

---

[9] *Id.*

[10] *Introducing the New Ray-Ban Meta Smart Glasses*, Meta Newsroom (Sept. 27, 2023), https://about.fb.com/news/2023/09/new-ray-ban-meta-smart-glasses/ (last accessed Mar. 15, 2026).

[11] *Id.*

[12] *Snapdragon AR1 Gen 1 Platform*, Qualcomm, https://www.qualcomm.com/xr-vr-ar/products/ar-series/snapdragon-ar1-gen-1-platform (last accessed Mar. 15, 2026).

[13] *Id.*

[14] *Meta Platforms, Inc., Capture photos and videos with AI glasses, Meta Help Center,* https://www.meta.com/help/ai-glasses/272319252352130/ (last accessed Mar. 15, 2026).

---

CLASS ACTION COMPLAINT                                    HECHT PARTNERS LLP

8

transferred to the user's phone and removed from the glasses, after which it can be stored, managed, edited, or shared through Meta's software ecosystem and social-media platforms.

39. The glasses also integrate with Meta's artificial-intelligence assistant, which allows users to interact with the device using voice commands. Users can activate the AI assistant by saying the wake phrase "Hey Meta," enabling the glasses to respond to questions, provide information, and control device functions using Meta's AI systems.[15]

40. When users interact with Meta AI through the glasses by issuing voice commands, the device can capture an image of the wearer's surroundings and transmit that photo to Meta's cloud for processing with artificial-intelligence systems. After the image is analyzed, Meta AI generates a response that is delivered to the user through the glasses' audio interface.[16]

41. The artificial-intelligence assistant integrated into the glasses forms part of Meta's broader AI ecosystem. In 2025, Meta introduced a dedicated Meta AI application and explained that the assistant "uses Llama 4." Meta further stated that Meta AI is used across its products, including WhatsApp, Instagram, Facebook, Messenger, and Meta AI Glasses.[17]

42. Meta's Meta AI assistant operates as part of the company's broader artificial-intelligence ecosystem. Meta has publicly stated that its AI products—including Meta AI—are powered by its Llama family of large-language models. These models are designed to process multiple forms of input, including text and images. As a result, when users interact with Meta AI through the glasses—such as by asking questions about what they are seeing—visual information captured by the device can be transmitted to Meta's AI systems for analysis, enabling the system to generate responses based on the visual content.

43. Meta describes the Meta AI assistant as a system designed to help users "solve problems, navigate your daily questions, and better understand the world around you."[18] Through

[15] *Id.*

[16] *Ask Meta AI About What You See on AI Glasses*, Meta Platforms, Inc., https://www.meta.com/help/ai-glasses/718045509827730/ (last accessed Mar. 15, 2026).

[17] Introducing the Meta AI App: A New Way to Access Your AI Assistant, Meta Newsroom (Apr. 29, 2025), https://about.fb.com/news/2025/04/introducing-meta-ai-app-new-way-access-ai-assistant/ (last accessed Mar. 15, 2026).

[18] *Id.*

---

CLASS ACTION COMPLAINT

HECHT PARTNERS LLP

the glasses, this capability allows users to interact with the assistant using voice commands and receive AI-generated responses to their questions.

44.     The operation of the Meta AI Glasses involves several stages of data capture and processing. First, the glasses capture audiovisual information through the device's cameras and microphones. The captured media can then be imported into the Meta AI mobile application on a paired smartphone, where users can manage and share the content. When users interact with Meta AI—such as by asking questions through voice commands—the assistant processes the user's request and generates responses delivered through the glasses' audio interface.[19]

45.     On information and belief, audiovisual inputs captured by the glasses provide uniquely valuable data for Meta's artificial-intelligence systems. Unlike traditional social-media services, which rely primarily on content voluntarily uploaded by users, the Meta AI Glasses capture real-world scenes, objects, and conversations directly from users' everyday environments. This multimodal data provides valuable inputs for artificial-intelligence development. By capturing real-world scenes, objects, and conversations directly from users' environments, the glasses generate datasets that may enable Meta's AI models—including the Llama models that power Meta AI—to learn to interpret visual and auditory contexts.

### *Defendants Marketed the Glasses as Privacy-Protective and User-Controlled*

46.     From the time the smart glasses were first introduced, Defendants promoted the product as one designed with privacy safeguards and user control over personal data. In press materials announcing the launch of the glasses in September 2021, Defendants represented that the device was "designed with privacy in mind" and included features intended to provide "control and peace of mind to both device owners and bystanders."[20]

47.     Defendants highlighted privacy protections as a central selling point for the Meta AI Glasses. In product pages, advertising campaigns, and promotional materials, Defendants assured

---

[19] *Id.*

[20] Meta Platforms, *Introducing Ray-Ban Stories: First-Generation Smart Glasses* (Sept. 9, 2021), https://about.fb.com/news/2021/09/introducing-ray-ban-stories-smart-glasses/ (last accessed Mar. 15, 2026).

consumers that users maintained authority over their information, promoting the device with statements such as "Designed for privacy, controlled by you" and "You're in control of your data and content." Defendants similarly represented that the glasses were "built for your privacy and others' too."[21]

48. These assurances were not buried in fine print. To the contrary, Defendants placed their privacy claims prominently in marketing materials and on their website. For example, the statement "Designed for privacy, controlled by you" appears in large, bold text on the Meta AI Glasses privacy webpage: [22]



49. Defendants also represented that the glasses include device settings and software controls allowing users to manage the content captured by the device and determine how that content is stored, used, and shared. In marketing materials and product descriptions, Defendants emphasized that users remained in control of their information, prominently stating: "You're in control of your data and content." Defendants further represented that "clear, easy device and app settings help you manage your information," enabling users to decide "what content you choose to share with others, and when."[23]

---

[21] Meta Platforms, Inc., *Privacy and Your AI Glasses*, Meta, https://www.meta.com/ai-glasses/privacy/ (last visited Mar. 15, 2026).

[22] Meta Platforms, Inc., *Privacy and Your AI Glasses*, Meta, https://www.meta.com/ai-glasses/privacy/ (last visited Mar. 15, 2026).

[23] *Id.*

CLASS ACTION COMPLAINT                                    HECHT PARTNERS LLP



50. Defendants further emphasized that the glasses include visual indicators intended to alert individuals nearby when recording occurs. For example, Defendants explained that "[a] hard-wired capture LED lights up to let people nearby know when you're taking a photo or video." Defendants promoted this feature as a mechanism intended to notify bystanders when recording occurs.[24]

51. Defendants also described how data collected by the glasses would be handled. Defendants represented that "[b]y default, Ray-Ban Stories smart glasses collect data that's needed to make your glasses work and function," including battery status, account credentials used to authenticate users in the companion application, and connectivity information. Defendants further represented that users could "opt-in to share additional data … with Facebook for product development, improvement, and personalization," and that "[t]his setting can be changed at any time."[25]

52. Defendants similarly represented that certain voice-activated features were optional

---

[24] Meta Platforms, *Introducing Ray-Ban Stories: First-Generation Smart Glasses* (Sept. 9, 2021), https://about.fb.com/news/2021/09/introducing-ray-ban-stories-smart-glasses/ (last accessed Mar. 15, 2026).

[25] *Ray-Ban and Facebook Introduce Ray-Ban Stories, First-Generation Smart Glasses, Meta Tech (Sept. 9, 2021),* https://tech.facebook.com/reality-labs/2021/9/ray-ban-and-facebook-introduce-ray-ban-stories-first-generation-smart-glasses/ (last accessed Mar. 15, 2026).

---

CLASS ACTION COMPLAINT

HECHT PARTNERS LLP

and subject to user control. For example, Defendants stated that "[t]he use of Facebook Assistant for voice command-powered capture is totally optional." Defendants further represented that "[y]ou can view and delete your voice transcripts," and that "[y]ou always have the option to turn off voice storage and/or Facebook Assistant in Settings."[26]

53.     Defendants continued emphasizing privacy features when promoting later generations of the glasses. In announcing the next generation of the product at the 2023 Meta Connect conference, Defendants stated that "a commitment to privacy continues to be at the core of the product." [27]   Defendants also represented that "the privacy LED light is now bigger and more noticeable."[28]

54.     Through these and similar statements in press releases, marketing materials, and product webpages, Defendants conveyed to consumers that the Meta AI Glasses incorporated privacy safeguards and provided users with control over the collection and use of information captured by the device.

55.     These representations were material to consumers. Devices worn on a user's face that contain cameras, microphones, and artificial-intelligence features capable of analyzing the surrounding environment raise significant privacy concerns for both users and individuals nearby. Defendants' assurances regarding privacy safeguards and user-controlled data settings were therefore likely to influence reasonable consumers' purchasing decisions.

56.     Reasonable consumers purchasing a wearable device marketed as "designed for privacy" and "controlled by you" would understand that any artificial-intelligence processing occurs through automated computer systems at *the user's option*—not through compulsory human review of intimate audiovisual recordings captured inside their homes or other private spaces. Defendants' marketing reinforced that understanding by repeatedly emphasizing user control and privacy safeguards while omitting the existence of human review of recordings.

---

[26] *Id.*

[27] EssilorLuxottica, *Ray-Ban and Meta Launch the Next Generation of Smart Glasses* (Sept. 27, 2023), https://www.essilorluxottica.com/en/newsroom/press-releases/ray-ban-and-meta-launch-the-next-generation-of-smart-glasses/ (last accessed Mar. 15, 2026).

[28] *Id.*

---

CLASS ACTION COMPLAINT                                                        HECHT PARTNERS LLP

***Defendants Failed to Disclose the True Scope of Data Transmission, Human Review, and AI Training Use.***

57.    Defendants possessed exclusive knowledge regarding the human-review processes used to train and evaluate their artificial-intelligence systems. This information was not reasonably accessible to consumers prior to purchase and could not have been discovered through reasonable diligence. Defendants nevertheless chose to market the Meta AI Glasses as privacy-protective while omitting these material facts.

58.    Although Defendants publicly emphasized privacy protections and user control, Defendants did not adequately disclose the full scope of how information captured by the Meta AI Glasses could be transmitted, analyzed, and reviewed through Meta's artificial-intelligence systems.

59.    For example, Meta's own policies acknowledge that media captured through the glasses may be transmitted beyond the device itself. Meta states that users "can use the AI Glasses to take photos and video recordings with audio (together, 'Media')," and that this Media "is captured on your AI Glasses and sent to your App." Meta further explains that it "will process your Media when you turn on cloud processing on your AI Glasses, interact with the Meta AI service on your AI Glasses, or upload your Media to certain services provided by Meta (i.e., Facebook or Instagram)."[29] These disclosures frame media collection as occurring when users affirmatively enable certain functions—such as cloud processing, interaction with Meta AI, or uploading media—while providing limited explanation regarding the full scope of downstream processing, analysis, and potential human review associated with those interactions.

60.    Meta's AI terms also acknowledge that interactions with the company's artificial-intelligence systems may be reviewed. Meta states that it may "review your interactions with AIs, including the content of your conversations with or messages to AIs," and that "this review may be automated or manual (human)."[30] However, these statements appear in lengthy terms and policy

[29] Meta Platforms, *Supplemental Meta Platforms Technologies Privacy Policy*, https://www.meta.com/legal/privacy-policy/ (last accessed Mar. 15, 2026).

[30] Meta Platforms, Inc., *Meta AIs Terms of Service* (Dec. 18, 2025), https://www.facebook.com/legal/ai-terms (last accessed Mar. 15, 2026).

documents rather than in Defendants' consumer-facing marketing materials and do not explain the scope of any human review processes associated with users' AI interactions through the glasses.

61.    Defendant Meta's disclosures do not clearly explain the extent to which interactions with the AI assistant require information captured by the glasses—including images, audio, and other inputs—to be transmitted to Meta's infrastructure for processing. Instead, the glasses are marketed primarily as an assistant that responds to user prompts and questions through Meta's AI systems, which are activated through the wake phrase "Hey Meta."

62.    These statements do not adequately inform consumers that audiovisual information captured by the glasses may ultimately be processed, reviewed—including by human reviewers— and used to improve and develop Meta's artificial-intelligence systems.

63.    On information and belief, audiovisual information captured through the Meta AI Glasses—including images, audio recordings, and contextual information from users' surroundings—may be analyzed and incorporated into Meta's artificial-intelligence development processes. Such data provides real-world multimodal inputs that can be used to evaluate, refine, and enhance Meta's AI models, including the Llama models that power Meta AI.

64.    As a result, Defendants' public statements and privacy representations created the misleading impression that users maintained meaningful control over how data captured by the Meta AI Glasses would be used, while failing to disclose the full extent to which such data could be transmitted to Meta's servers, reviewed by human personnel, and incorporated into Meta's AI development processes.

65.    Defendants' marketing created the impression that interactions with the Meta AI assistant were processed automatically by computer systems *controlled by the user*. In reality, audiovisual recordings captured through the glasses could be involuntarily routed into human-review pipelines used to train and evaluate Meta's artificial-intelligence systems.

***Investigative Reporting Revealed That Sensitive User Content Was Reviewed By Human Contractors***

66.    When users activate the artificial-intelligence features of the Meta AI Glasses—such

as by pressing the capture button or issuing the wake command "Hey Meta"—the device records audiovisual information from the wearer's surroundings. That information is transmitted through Meta's infrastructure for AI processing.

67.    Like other voice-activated systems, the "Hey Meta" wake command can be triggered accidentally or by background speech, resulting in recordings occurring when users did not intend to activate the device.

68.    Testing conducted by investigative journalists confirmed that the glasses communicate with Meta servers during ordinary use.[31] Analysis of network traffic showed repeated connections between the Meta application and Meta-controlled servers when the glasses were used to interact with the AI assistant. The investigation further determined that the AI features of the glasses cannot function solely through local processing on the device or smartphone; instead, captured information must be transmitted through Meta's infrastructure in order for the system to interpret images, answer questions, and respond to prompts.

69.    Despite these data transmissions, Defendants' marketing materials and privacy representations did not adequately disclose where the transmitted data ultimately goes, who may access or review it once it reaches Meta's systems, or the extent to which such data may be used in connection with the development and improvement of Meta's artificial-intelligence technologies.

70.    In February 2026, the Swedish newspapers *Svenska Dagbladet* and *Göteborgs-Posten* published a joint investigation examining the human labor used to train and evaluate Meta's AI systems associated with the smart glasses. The investigation was based on interviews with more than thirty workers involved in reviewing images, videos, and speech data used to train Meta's AI systems.

71.    The investigation reported that Meta relies on human contractors who review and label captured content so that Meta's systems can learn to interpret real-world scenes and conversations. These workers are referred to as "data annotators," individuals responsible for

---

[31] Naipanoi Lepapa et al., *She Came Out of the Bathroom Naked, Employee Says*, Svenska Dagbladet (SvD), https://www.svd.se/a/K8nrV4/metas-ai-smart-glasses-and-data-privacy-concerns-workers-say-we-see-everything (last accessed Mar. 15, 2026).

---

CLASS ACTION COMPLAINT                                    HECHT PARTNERS LLP

reviewing and labeling captured images, videos, and transcripts so that Meta's AI systems can better understand real-world environments.[32] The report describes these workers as "the manual labourers of the AI revolution," responsible for labeling and reviewing real-world footage that trains Meta's artificial-intelligence technologies.[33]

72. Workers interviewed for the investigation described reviewing highly sensitive recordings captured through everyday use of the glasses. According to the report, annotators encountered "deeply private video clips, which appear to come straight out of Western homes, from people who use the glasses in their everyday lives."[34]

73. Workers interviewed for the investigation described reviewing recordings that included individuals using bathrooms, undressing, or otherwise appearing in intimate situations. According to the report, one worker stated that "in some videos you can see someone going to the toilet, or getting undressed," adding that "I don't think they know, because if they knew they wouldn't be recording."[35]

74. Workers also reported seeing recordings of nudity and sexual activity captured by the glasses. According to the report, one worker stated that "we see everything – from living rooms to naked bodies," describing footage of ordinary people inside their homes.[36] Workers further reported that some recordings included "sex scenes filmed with the smart glasses," including situations where an individual was wearing the glasses while engaged in sexual activity.[37]

75. The investigation also described footage in which users recorded intimate moments involving other individuals without their apparent awareness. For example, workers reported seeing clips in which a user placed the glasses on a bedside table and left the room, after which the device captured another person entering and changing clothes.

76. In addition to intimate footage, workers reported reviewing recordings that exposed

---

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.*

---

CLASS ACTION COMPLAINT

HECHT PARTNERS LLP

17

sensitive personal information. The report describes videos in which bank cards and other financial details were visible on camera. Workers also reported reviewing user conversations and transcriptions generated through interactions with the AI assistant, including discussions about crimes, protests, and sexually explicit comments about other individuals.

77. According to the investigation, the annotation work involved reviewing not only visual recordings but also text and speech data generated through interactions with the AI assistant. Workers described reviewing user prompts and AI responses through transcription tasks to verify that the system answered questions correctly as part of the broader process of training and evaluating Meta's AI systems.

78. The investigation further revealed that this annotation work was performed by contractors located thousands of miles away from the users whose data was captured. The workers interviewed were employed by a subcontractor operating in Nairobi, Kenya, where employees annotate and review images, videos, and transcriptions used in connection with Meta's AI systems.

79. The report explains that these workers examine images, videos, and speech data as part of the process of training and evaluating Meta's AI systems. Through this annotation work, the material is analyzed and labeled so that Meta's systems can learn to recognize objects, scenes, and conversations.

80. Despite the existence of this human-review pipeline, Defendants' marketing materials and privacy representations did not clearly disclose that audiovisual information captured by the Meta AI Glasses could be reviewed by human contractors located in other countries as part of the processes used to train and evaluate Meta's AI systems.

81. When journalists sought answers from Meta regarding how highly private recordings could reach human reviewers or how the company informs users about these practices, Meta did not provide direct responses. Instead, the company referred reporters to its existing terms of use and privacy policies without addressing the specific questions raised by the investigation.

82. As a result, consumers using the Meta AI Glasses were not clearly informed that audiovisual recordings captured by the device—including recordings of nudity, sexual activity, private household moments, financial information, and personal conversations—could be

transmitted to Meta's systems, reviewed by human contractors located abroad, and used as part of the processes through which Meta develops and improves its artificial-intelligence technologies.

### *Meta's Misrepresentations and Omissions Regarding Privacy and Data Security*

83. Meta's data practices are governed in part by Meta's privacy policy and other documents, which purport to disclose how personal information is collected and used. However, the disclosures fail to adequately inform consumers that the Meta AI Glasses may record, analyze, and transmit sensitive information—including facial imagery, voice data, location data, and contextual environmental data—for purposes including AI model training, targeted advertising, and product development.

84. Since the launch of the Meta AI Glasses in September 2021, Meta has represented that users had control over their private data, and that such data would not be used or shared without users' consent.

85. Defendants promoted user privacy as a core feature of the Glasses, and did so across multiple advertising channels, including representations on Meta's website.

86. In fact, Meta's website has an entire separate page dedicated to the privacy features of the Meta AI Glasses, https://www.meta.com/ai-glasses/privacy/, which states that the Meta AI Glasses are "designed for privacy, controlled by you." The same page states: "You're in control of your data and content. Clear, easy device and app settings help you manage your information, giving you control over what content you choose to share with others, and when." It also states that the Glasses have "Privacy Settings that matter. Easy to access settings let you view and manage the information you share with Meta. Meta collects data needed to help ensure your glasses and app are reliable, secure, and operating normally. You can choose to share additional data to improve the experience."[38]

87. Meta also represents that the Glasses are "[b]uilt for your privacy and others' too," and that "[w]hen you use your glasses camera for AI features," Meta takes "steps to protect people's privacy, like removing key identifiable information."[39]

---

[38] https://www.meta.com/ai-glasses/privacy/ (last accessed Mar. 15, 2026).
[39] *Id.*

CLASS ACTION COMPLAINT                                    HECHT PARTNERS LLP

88.    In its "Supplemental Meta Platforms Technology Privacy Policy," Meta represents to consumers that "Additional Data" would only be shared with the user's consent, and that "Meta will use Additional Data for these purposes [of improving Meta products] if you choose to share Additional Data with Meta during your initial setup, and you can change your choice at any time in Settings."[40]

89.    Meta's privacy policy states that Meta users "can use the AI Glasses to take photos and video recordings with audio (together 'Media'). This Media is captured on your AI Glasses and sent to your App. We will collect your Media when you turn on cloud processing on your AI Glasses, interact with the Meta AI service on your AI Glasses, or upload your Media to certain services provided by Meta (i.e., Facebook or Instagram). You can change your choices about cloud processing of your Media at any time in Settings."[41] This statement is misleading, because it implies that "media" is only collected when users affirmatively intend and elect to do so. This statement also fails to disclose that such media will be collected at times that the user does not intend, or that it will be shared with third parties—both of which are material facts known only to Defendants.

90.    In its "Supplemental Meta Platforms Technologies Terms of Service," Meta states that "we don't sell your personal data to advertisers, and we don't share information that directly identifies you (such as your name, email address or other contact information) with advertisers unless you give us specific permission."[42] This statement misleadingly implies that Meta will not collect audiovisual recordings and transmit them to third parties.

91.    Plaintiff and Class Members relied on Defendants' privacy assurances when purchasing the Glasses.

92.    Despite the sensitive nature of the information collected, Defendants fail to provide clear and conspicuous disclosures explaining the full scope of their data practices, including the extent to which captured content may be stored, analyzed, shared with third parties, or used to train artificial intelligence systems.

---

[40] https://www.meta.com/ca/legal/privacy-policy/ (last accessed Mar. 15, 2026).

[41] *Id*.

[42] https://www.meta.com/ca/legal/supplemental-terms-of-service/ (last accessed Mar. 15, 2026).

93. At no point in any public statement, press release, online advertisement, or any other context, did Meta or Luxottica disclose that the Meta AI Glasses collect audiovisual recordings, without users' knowledge, intent, or consent, to be disseminated for manual review for the purpose of developing Meta's AI model. Defendants also never obtained users' consent before doing so.

### *Plaintiff and Class Members Did Not Consent to Meta's Conduct*

94. Meta's privacy disclosures are contained within multiple separate documents including the Supplemental Meta Platforms Technologies Privacy Policy, the Meta AI Terms of Service, the Meta Voice Controls Privacy Notice, and the Supplemental Meta Platforms Technologies Terms of Service. Each document cross-references the others, creating a network of purported disclosures that no reasonable consumer would read entirely, let alone have a coherent understanding of how their data is actually used.

95. The disclosures about human review are buried in subsections nominally about voice recording storage, separated from the default-on disclosures about transcript storage. Thus, a user who reads only the primary privacy policy, which is lengthy and cross-references other documents, would not learn that "trained reviewers" means underpaid data annotators employed by a commercial subcontractor in Nairobi, Kenya, as "trained reviewers" is not defined.

96. Meta does not specify what "trained reviewers" means, does not name Sama, does not identify Kenya as a processing location, and does not describe human review of intimate video footage.

97. Although it is "[b]uried in Meta's AI terms of use," Meta states that it may "'review your interactions with AIs, including the content of your conversations with or messages to AIs, and this review can be automated or manual (human).'"[43] This statement, however, does not explain that audiovisual recordings will be made and transmitted to third parties. Furthermore, "given the kind of information data annotators are being asked to review, many users don't appear to be aware of that last piece of advice. Worst of all, owners of Meta's AI glasses simply don't have the option of making

---

[43] Victor Tangermann, "Meta Workers Say They're Seeing Disturbing Things Through Users' Smart Glasses," March 2, 2026, https://futurism.com/artificial-intelligence/meta-disturbing-smart-glasses.

CLASS ACTION COMPLAINT

HECHT PARTNERS LLP

use of the AI features without agreeing to share data shared with Meta's remote servers. And once the data is sent, it's already often too late."[44]

98.    All of this information is and was highly relevant to Plaintiff and Class Members when they decided to purchase and use the Glasses.

99.    At no point in any of Meta's privacy documents does Meta disclose that intimate video footage—including nudity, sexual activity, and bathroom visits—is reviewed by human annotators, that those annotators are employed by Sama, a commercial data-labeling subcontractor and the annotation takes place in Nairobi, Kenya, that Meta's face-anonymization algorithm frequently fails, leaving faces and bodies visible to reviewers, or that footage captured during false or accidental activations of the "Hey Meta" wake word is also transmitted to the annotators.

100.    No reasonable consumer reading Meta's privacy policies would understand that wearing the Glasses in their home could result in footage of family members undressing, children bathing, private banking details, or private conversations being transmitted to a location in Kenya to be viewed by strangers.

101.    Defendants' representations regarding user privacy and data security were false and misleading, and Defendants failed to disclose to customers the truth about how their personal data would be collected, transmitted to, and reviewed by third parties.

## CLASS ACTION ALLEGATIONS

102.    Plaintiff brings this action as a class action on behalf of themselves, and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), and seek certification of the following Classes:

**Nationwide Class:** All persons residing in the United States who purchased, owned, or used Meta AI Glasses during the limitations period.

103.    Excluded from the Class are Defendants and any entity in which either has a controlling interest, current and former officers, directors, and employees of Defendants, the judges

---

[44] *Id.*

CLASS ACTION COMPLAINT                                    HECHT PARTNERS LLP

and court staff assigned to this matter, and counsel for all parties.

104.    Plaintiff reserves the right to modify the definitions of the class, including by using additional subclasses, as appropriate based on further investigation and discovery obtained in the case.

105.    Members of the putative class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the putative class number in the millions. The precise number of members of each of the putative class and their identities are unknown at this time but may be determined through discovery. Members of the putative class may be notified of the pendency of this action by mail and/or publication through the distribution records of Meta.

106.    Common questions of law and fact exist as to all members of the putative class and predominate over questions affecting only individual class members. Common legal and factual questions include, but are not limited to, whether Meta has violated wiretapping statutes at issue here, and whether class members are entitled to statutory damages for the violations.

(a)    whether Defendants designed, marketed, and sold the Meta AI Glasses while representing that the devices were privacy-protective and under the user's control;

(b)    whether Defendants failed to disclose material facts regarding how audio, video, and other information captured by the Meta AI Glasses would be collected, transmitted, processed, reviewed, or otherwise used;

(c)    whether Meta intercepted, recorded, transmitted, stored, disclosed, or otherwise used Plaintiff's and Class Members' communications through the Meta AI Glasses;

(d)    whether Defendants obtained valid consent from Plaintiff and Class Members for the interception, collection, or disclosure of their communications;

(e)    whether Defendants' conduct violated the California Invasion of Privacy Act, the Federal Wiretap Act, and other laws asserted in this action;

(f)    whether Defendants' conduct constituted an intrusion upon the seclusion or private affairs of Plaintiff and Class Members;

(g)     whether Defendants were unjustly enriched through the sale of the Meta AI Glasses and the use of data captured through those devices; and

(h)     whether Plaintiff and Class Members are entitled to damages, statutory damages, restitution, disgorgement, injunctive relief, and other appropriate relief.

107.    Damages are capable of class-wide measurement through common proof, including statutory damages available under CIPA and the Federal Wiretap Act and the price premium paid by consumers for a product marketed as privacy-protective.

108.    The claims of the named Plaintiff are typical of the claims of the members of the putative class because the named Plaintiff, like all other class members, used the Meta AI Glasses and had their audio, video, or electronic communications intercepted, recorded, transmitted, stored, or disclosed by Meta.

109.    Plaintiff is an adequate representative of the putative class because his interests do not conflict with the interests of the class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of the members of the putative class will be fairly and adequately protected by Plaintiff and his counsel.

110.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the members of the putative class.  Each individual member of the putative class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Meta's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Meta's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

111.    Plaintiff brings all claims in this action individually and on behalf of the members of the putative class against Meta.

**COUNT I**
**Violation of the California Invasion of Privacy Act ("CIPA")**
**California Penal Code §§ 631, 632**
*(On behalf of Plaintiff and the Nationwide Class)*

112.    Plaintiff repeats the allegations contained in the  paragraphs 1 through 112 as if fully set forth herein.

113.    The California Invasion of Privacy Act ("CIPA") is codified at Sections 630 to 638 of the California Penal code.  The Act begins with its statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Pen. Code § 630.

114.    California Penal Code Section 631(a) provides, in pertinent part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to lawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars[.]

115.    Defendants' Meta AI Glasses constitute a "machine, instrument, contrivance, or … other manner" of interception under Section 631 of CIPA.

116.    Defendants. through the use of Meta AI Glasses, intentionally intercepted, acquired, and contemporaneously obtained Plaintiff's and Class Members' private and confidential electronic communications without their consent.

CLASS ACTION COMPLAINT                                                        HECHT PARTNERS LLP

25

117.    Furthermore, Defendants aided, agreed with, employed, or conspired with each other, as well as a third-party in another country, to intentionally intercept, acquire, and contemporaneously obtain Plaintiff's and Class Members' private and confidential electronic communications without their consent.

118.    At all relevant times, Defendants, through the use of Meta AI Glasses, willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read or learn the contents or meaning of electronic communications of Plaintiff and Class Members while those communications were in transit or passing over any wire, line or cable or were being sent from or received at any place within California.

119.    Defendant Meta's Terms of Service are governed by the laws of California. Upon information and belief, Defendant Meta utilities servers that are located in California.

120.    California Penal Code Section 632(a) provides, in pertinent part:

> A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars[.]

121.    The data collected by Defendants constitutes "confidential communications," as that term is used in Section 632 of CIPA, because Plaintiff and Class Members had objectively reasonable expectations of privacy with respect to the private audio and video communications recorded on their Meta AI Glasses.

122.    Defendants, through the Meta AI Glasses, eavesdropped upon or recorded Plaintiff's and Class Members' confidential communications.

123.    Under both Section 631(a) and 632(a) of CIPA, Defendants are required to show that they had the consent of all parties to a communication.

124.    Plaintiff and Class Members did not consent to any of Defendants' actions in implementing the wiretaps. Plaintiff and Class Members did not consent to Meta's access, interception, reading, learning, recording, collection, and disclosing of Plaintiff's and Class

CLASS ACTION COMPLAINT                                    HECHT PARTNERS LLP

26

Members' confidential electronic communications.

125.    Plaintiff and Class Members have been injured by violations of Section 631 and 632 of the California Penal Code, and thus seek all relief available under Section 637.2, including injunctive relief and statutory damages of $5,000 per violation.

**COUNT II**
**Violation of the Federal Wiretap Act**
**18 U.S.C. § 2510** *et seq.*
*(On behalf of Plaintiff and the Nationwide Class)*

126.    Plaintiff repeats the allegations contained in the paragraphs 1 through 112 as if fully set forth herein.

127.    The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, prohibits the intentional interception of the contents of any wire, oral, or electronic communication through the use of a device. 18 U.S.C. § 2511.

128.    Defendants' actions in intercepting, transmitting, and disclosing users' electronic communications recorded on Meta AI Glasses to an undisclosed third-party in another country were intentional. Defendants knowingly designed and implemented systems that transmitted captured audiovisual recordings to their servers for processing, analysis, and review.

129.    These transmissions—the private audio and video communications recorded on Plaintiff's and Class Members' Meta AI Glasses—were intercepted without authorization and are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce[,]" and were therefore "electronic communications" within the meaning of 18 U.S.C § 2510(12).

130.    Defendants' interception of electronic communications that Plaintiff and Class Members were sending and receiving was done contemporaneously with Plaintiff's and Class Members' sending and receipt of those communications.

131.    The electronic communications intercepted by Defendants included "contents" of electronic communications as defined by 18 U.S.C. § 2510 because it included audio and video

communications.

132.    Defendants' Meta AI Glasses constitute "devices" within the meaning of 18 U.S.C. 2510(5).

133.    Defendants, in the conduct alleged here, were not providing an "electronic communication service" as that term is defined in 18 U.S.C. § 2510(12) and used elsewhere in the Wiretap Act. Defendants were not acting as an Internet Service Provider.

134.    Plaintiff and Class Members did not consent to Defendants' continued gathering of their electronic communications.

135.    After intercepting the communications, Defendants disclosed the contents of the communications knowing or having reason to know that such information was obtained through the interception of electronic communications in violation of 18 U.S.C. § 2511(1)(c).

136.    Defendants used and disclosed the contents of those communications with third parties for the purpose of committing a crime or tort, including but not limited to, the tort of intrusion upon seclusion.

137.    As a result of this conduct, the Court may assess statutory damages to Plaintiff and Class Members; injunctive and declaratory relief; punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendants in the future, and reasonable attorneys' fees and other litigations costs reasonably incurred.

**COUNT III**
**Intrusion Upon Seclusion**
*(On behalf of Plaintiff and the Nationwide Class)*

138.    Plaintiff repeats the allegations contained in the  paragraphs 1 through 112 as if fully set forth herein.

139.    Under California law, Plaintiff asserting claims for intrusion upon seclusion must plead two elements: (1) an intentional intrusion upon a private place, conversation, or matter; and (2) the intrusion must be in a manner highly offensive to a reasonable person.

140.    Defendants intentionally intruded into Plaintiff's and Class Members' private affairs in a highly offensive manner through its interception, transmission, and disclosure of Plaintiff's and Class Members' audio and video communications to human data annotators in Nairobi, Kenya.

141.    Defendants' intentional intrusion is highly offensive to a reasonable person because Plaintiff and Class Members have a reasonable expectation of privacy in the audio and video communications recorded on their Meta AI Glasses, particularly in places such as their homes, while using the bathroom or changing rooms, or during private conversations.

142.    Plaintiff could not reasonably expect that by simply using the Meta AI Glasses, which have AI features that are inherently understood to be performed by computer systems, Defendants would intercept, transmit, and disclose their private audio and video communications to a third-party in another country, let alone one that employs human data annotators to review their private communications.

143.    Defendants' intrusion upon Plaintiff's and Class Members' private affairs and concerns are highly offensive to an ordinary reasonable person, especially considering: (a) the highly sensitive and personal nature of the audio and video communications at issue; (b) the extensive scope of the intrusion, with millions of users nationwide; (c) Defendants' removal of the audio recording opt-out feature in or around April 2025; (d) Defendants' active concealment of the extent of the human review employed for Meta AI; (e) the failure of the Glasses' anonymization feature when disclosing the audio and video communications to human annotators; and (f) the international transfer of data to an undisclosed third-party in another country without comparable data privacy protections.

144.    Defendants' conduct would be highly offensive to a reasonable person, particularly given Defendants' extensive and false public statements regarding their commitment to user privacy.

145.    Defendants' conduct has harmed Plaintiff and Class Members by diminishing the value of their private audio and video communications, and causing loss of privacy, due to Defendants rendering no longer private the confidential audio and video communications that Plaintiff and Class Members intended to remain private.

146.    As a result of Defendants' conduct, Plaintiff and Class Members seek actual damages,

CLASS ACTION COMPLAINT                                    HECHT PARTNERS LLP

compensatory damages, restitution, disgorgement, general damages, nominal damages, unjust enrichment, punitive damages, and any other relief the Court deems just.

**COUNT IV**
**Unjust Enrichment**
*(On behalf of Plaintiff and the Nationwide Class)*

147.    Plaintiff repeats the allegations contained in the  paragraphs 1 through 112 as if fully set forth herein.

148.    To the extent required by law, this count is alleged in the alternative to legal claims pursuant to Fed. R. Civ. P. 8.

149.    Plaintiff and Class Members conferred a monetary benefit on Defendants. Specifically, they purchased the Meta AI Glasses from Defendants and/or their agents and in doing so provided Defendants with their private audio and video communications.

150.    Had Plaintiff known Defendants would intercept, transmit, and disclose their private audio and video communications to an undisclosed third-party in another country, Plaintiff may have paid significantly less for the Meta AI Glasses, or simply would not have purchased them at all.

151.    Defendants knew that Plaintiff and Class Members conferred a benefit upon Defendants which they accepted. Defendants profited from Plaintiff and Class Members private audio and video communications and used the communications for commercial purposes, including the training of its Llama AI models, product development, and improving its targeted marketing systems. Audiovisual recordings captured through the Meta AI Glasses provide uniquely valuable real-world datasets used to train and improve artificial-intelligence systems, conferring substantial economic value on Defendants. Defendants also received the monetary benefit from the sale of the Glasses themselves.

152.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the wrongfully and unlawfully received benefits at the expense of Plaintiff and Class Members.

153.    Plaintiff and Class Members have no adequate remedy at law for this count.

154.    As a direct and proximate result of Defendants' actions, Plaintiff and Class Members

CLASS ACTION COMPLAINT                                    HECHT PARTNERS LLP

have suffered and will continue to suffer injury.

155.    Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiff and Class Members overpaid for Defendants' Meta AI Glasses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Meta, as follows:

a.    For an order certifying the putative class, naming Plaintiff as the representatives of the putative class, and naming Plaintiff's attorneys as Class Counsel to represent the members of the putative class;

b.    For an order declaring that Meta's conduct violates the statutes referenced herein;

c.    For an order finding in favor of Plaintiff and the putative class on all counts asserted herein;

d.    For actual and/or statutory damages in amounts to be determined by the Court and/or jury;

e.    For prejudgment interest on all amounts awarded;

f.    For injunctive relief as pleaded or as the Court may deem proper; and

g.    For an order awarding Plaintiff and the putative class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated:  March 19, 2026                         Respectfully submitted,

**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**

By:    _/s/ Michael F. Ram_
MICHAEL F. RAM (SBN 104805)
1390 Market Street, Suite 200
San Francisco, CA 94102
Telephone:    (415) 358-6913

CLASS ACTION COMPLAINT                              HECHT PARTNERS LLP

31

Facsimile:     (415) 358-6923
Email: mram@forthepeople.com

**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
John A. Yanchunis*
201 North Franklin Street, 7th Floor
Tampa, Florida 33602
jyanchunis@forthepeople.com


**HECHT PARTNERS LLP**
Kathryn (Lee) Boyd
Cal. Bar. No. 189496
2121 Avenue of the Stars, Suite 800
Los Angeles, CA 90067
Telephone: (646) 502-9515
lboyd@hechtpartners.com

**HECHT PARTNERS LLP**
Lori G. Feldman*
David L. Hecht*
Brittany L. Sackrin*
Justin Alvarez-Herman*
Tiffany Wong*
125 Park Avenue, 25th Floor
New York, NY 10017
Phone: (212) 851-6821
dhecht@hechtpartners.com
lfeldman@hechtpartners.com
bsackrin@hechtpartners.com
jalvarezherman@hechtpartners.com
twong@hechtpartners.com

**EMERSON FIRM, PLLC**
John G. Emerson*
2500 Wilcrest, Suite 300
Houston, TX 77042-2754
Telephone: (800) 551-8649
Facsimile: (501) 286-4659
jemerson@emersonfirm.com


*Attorneys for Plaintiffs*

*\*Pro Hac Vice forthcoming*

---

CLASS ACTION COMPLAINT                                           HECHT PARTNERS LLP